Belair Care Center, Inc. et al., Plaintiffs,

against
Cool Insuring Agency, Inc. et al., Defendants.


1476-14

Barclay Damon, LLP
Attorneys for Plaintiff
(Linda J. Clark, David M. Cost and Joseph A. Murphy, of counsel)
80 State Street
Albany, New York 12207
Maguire Cardona, P.C.
Attorneys for Cool Insuring Agency, Inc., Hickey-Finn & Co., Inc. and Vanner Insurance Agency
(Kathleen A. Barclay, of counsel)
The Sage Mansion
16 Sage Estate
Albany, New York 12204
Keidel, Weldon & Cunningham, LLP
Attorneys for Hirsch Wolf & Co., Inc., Marshall & Sterling, Inc. and The Treiber Group, LLC
(Stephen C. Cunningham and John J. Iacobucci, Jr., of counsel)
925 Westchester Avenue
White Plains, New York 10604
Kaufman, Borgeest & Ryan LLP
Attorneys for HUB International Northeast Limited, HUB International Group Northeast Inc., and HUB International Limited
(Lee E. Berger and Daniel A. Schilling, of counsel) 
200 Summit Lake Drive, 1st Floor
Valhalla, New York 10595
Golden, Rothschild, Spagnola, Lundell, Boylan & Garubo, P.C.
Attorneys for Rampart Agency, Inc.
(Jeffrey M. Kadish, of counsel)
1011 Route 22 West, Suite 300
PO Box 6881
Bridgewater, New Jersey 08807
D'Amato & Lynch, LLP
Attorneys for The Reis Group, Shel-Bern Assoc. and Spain Agency, Inc. 
(Lloyd J. Herman, of counsel)
Two World Financial Center
New York, New York 10281


Richard M. Platkin, J.

Pending before the Court are five separate motions made by defendants pursuant to CPLR 3211 (a) (1), (5) and (7), seeking the pre-answer dismissal of plaintiffs' amended complaint.
BACKGROUND
The plaintiffs in this action are healthcare providers that conducted business in New York State and were required to provide workers' compensation insurance to their employees. To fulfill this obligation, plaintiffs became members of the Healthcare Industry Trust of New York ("HITNY" or "Trust"). The Trust is a group self-insured trust ("GSIT") formed pursuant to Workers' Compensation Law § 50 (3-a) in or about September 1999. In connection with Trust membership, each plaintiff executed a Joinder and Indemnification Agreement assenting to the imposition of joint and several liability.
On December 31, 2007, the New York State Workers' Compensation Board ("WCB") assumed administration of the Trust after finding it to be insolvent. Around this time, the Trust had an estimated deficit of $91 million. Thereafter, the WCB issued letters to plaintiffs (and other Trust members) advising them that they were jointly and severally liable for the Trust's accumulated deficit. Each plaintiff was informed of its pro rata share of the deficit and advised that collection actions would be initiated if the assessments were not paid.
On July 10, 2009, certain plaintiffs (along with other Trust members) commenced a lawsuit seeking to recover the amount of the accumulated deficit from other individuals and entities involved with the Trust, including: (a) Compensation Risk Managers, LLC ("CRM"), which served as group administrator to the Trust; (b) certain entities and individuals associated with CRM; and (c) the HITNY trustees (HITNY v CRM, Index No. 5966-09 ["HITNY Action" or "Member Action"]). Prior to serving the summons and complaint ("Original HITNY Complaint"), plaintiffs filed a First Amended Complaint on November 2, 2009.
In December 2009, a forensic audit commissioned by the WCB showed that the Trust's [*2]accumulated deficit had risen to more than $220,000,000. Thereafter, plaintiffs filed a Second Amended Complaint on March 12, 2010 to join new parties, add new causes of action, and plead new damages.
On December 17, 2012, certain plaintiffs commenced a new action in this Court against three insurance brokers (Sea Crest Health Center v Hirsch Wolf & Co., Index No. 6774-12 ["Sea Crest Action"]). This separate action was instituted in order to allow the Sea Crest plaintiffs to assert new claims against certain insurance brokers, notwithstanding the various litigation stays imposed in the HITNY Action.[FN1]

After the stays were lifted, plaintiffs moved for leave to file and serve a Third Amended Complaint on April 26, 2013. That motion was granted in a Decision & Order dated October 1, 2013, and the complaint was filed on November 12, 2013. As the Third Amended Complaint included the same claims raised in Sea Crest, the latter action was discontinued via a Stipulation of Discontinuance filed on March 5, 2014. The Stipulation of Discontinuance gave the Sea Crest plaintiffs the benefit of the action's December 17, 2012 commencement date, while preserving the right of the defendant-brokers to assert that plaintiffs' claims do not relate back to prior HITNY complaints.
Pursuant to a stipulation dated January 14, 2014, plaintiffs in the HITNY Action assigned all of their claims to the WCB, except for the claims against the insurance brokers. In an order dated March 3, 2014, the Court directed plaintiffs to file and serve a new complaint, under a separate index number, limited to claims against the insurance brokers that were not assigned to the WCB. The order specifically directed that the complaint shall not contain any new factual allegations or causes of action not encompassed in the Third Amended Complaint. On March 17, 2014, plaintiffs complied with the foregoing directives by commencing this action through the filing of a complaint ("Initial Complaint") against the insurance brokers.
Plaintiffs then moved for leave to amend the Initial Complaint on or about August 1, 2014. Disposition of that motion was held in abeyance at the request of the WCB in order to facilitate its efforts to reach a settlement with the remaining CRM individuals and entities. A settlement ultimately was reached in early 2016, and the Court permitted plaintiffs to withdraw the motion to amend, which had been stayed for more than one year, without prejudice to the filing of a new motion following the production of certain CRM-related documents by the WCB.
Plaintiffs refiled their motion to amend on June 3, 2016, seeking to add five new causes of action: breach of contract; negligence; false advertising; aiding and abetting breach of [*3]fiduciary duty; and aiding and abetting fraud. Plaintiff also sought to join five new defendants: Hirsch Wolf & Company, LLC d/b/a B.R. Wolf & Co. LLC ("Hirsch Wolf LLC"); HUB International Northeast Limited, HUB International Group Northeast Inc., and HUB International Limited; and Rampart Brokerage Corp. ("Rampart Brokerage"). In addition, the proposed amended complaint sought to add and/or clarify the factual allegations in support of the existing claims and the proposed new claims.
In a Decision & Order dated September 23, 2016 ("Prior Decision"), the Court granted-in-part and denied-in-part the motion to amend. The Court determined that the proposed amendments were futile as to Hickey-Finn & Co., Inc. ("Hickey-Finn") and Cool Insuring Agency, Inc. ("Cool") due to the expiration of the statute of limitations. For the same reason, the Court declined to allow plaintiffs to allege negligence and false advertising claims against The Treiber Group LLC ("Treiber"). The Court further concluded that the proposed false advertising claim, brought pursuant to General Business Law § 350, is patently lacking in merit and that proposed amended complaint failed to allege a legally sufficient basis for alter-ego liability against Hirsch Wolf LLC so as to warrant its joinder in this action.
Plaintiffs filed and served the amended complaint ("Complaint") on or about October 23, 2016, and the instant motion practice ensued.
STATUTE OF LIMITATIONS
Most, but not all, of the defendants move for dismissal of the Complaint pursuant to CPLR 3211 (a) (5), contending that plaintiffs' claims are barred in whole or in part by the expiration of the statute of limitations.[FN2]

Dismissal is warranted under CPLR 3211 (a) (5) where the movant establishes that a cause of action may not be maintained due to the expiration of the statute of limitations. The movant bears the initial burden of "support[ing] the motion with an affidavit or other competent proof sufficient, if uncontroverted, to establish the [statute of limitations] defense as a matter of law" (State Higher Educ. Services Corp. v Starr, 158 AD2d 771, 771 [3d Dept 1990]; accord Romanelli v DiSilvio, 76 AD3d 553, 554 [2d Dept 2010]). Upon such a showing, "the burden shifts to the party opposing the motion to aver evidentiary facts" sufficient to defeat the statute of limitations defense, or at least raise factual questions concerning the defense (Hoosac Val. Farmers Exch., Inc. v AG Assets, Inc., 168 AD2d 822, 823 [3d Dept 1990]; see Doyon v Bascom, 38 AD2d 645 [3d Dept 1971]).
A. Dates Applicable to Particular Moving Defendants
1. Law Governing Interposition of Claims
"In an action which is commenced by filing, a claim asserted in the complaint is interposed against the defendant or a co-defendant united in interest with such defendant when the action is commenced" (CPLR 203 [c]).
Pursuant to CPLR 203 (f), a "claim asserted in an amended pleading is deemed to have been interposed at the time the claims in the original pleading were interposed, unless the original pleading does not give notice of the transactions, occurrences, or series of transactions or occurrences, to be proved pursuant to the amended pleading." "The sine qua non of the [*4]relation[] back doctrine is notice, and the requisite notice must be contained in the [pleading to which relation back is sought]" (Lawyers' Fund for Client Protection of The State of New York v JP Morgan Chase Bank, N.A., 80 AD3d 1129, 1130 [3d Dept 2011]; see also US Bank N.A. v Gestetner, 103 AD3d 962 [3d Dept 2013]; August Bohl Contr. Co., Inc. v L.A. Swyer Co., Inc., 74 AD3d 1649 [3d Dept 2010]).
The relation-back doctrine also "allows a claim asserted against a defendant in an amended filing to relate back to claims previously asserted against a codefendant for Statute of Limitations purposes where the two defendants are 'united in interest'" (Buran v Coupal, 87 NY2d 173, 177 [1995]). Under this doctrine, relation back is available where "(1) both claims [arise] out of same conduct, transaction or occurrence, (2) the new party is united in interest with the original defendant, and by reason of that relationship can be charged with such notice of the institution of the action that he will not be prejudiced in maintaining his defense on the merits and (3) the new party knew or should have known that, but for [a] . . . mistake by plaintiff as to the identity of the proper parties, the action would have been brought against him as well" (id. at 178 [citations and quoted sources omitted]; see Mongardi v BJ's Wholesale Club, Inc., 45 AD3d 1149, 1150 [3d Dept 2007]).
2. Application to Particular Defendants
a. Cool
Cool first was named as a defendant and identified as a "Broker" in the Second Amended Complaint (¶ 155). This version of the complaint alleged that the defendant Brokers solicited plaintiffs to become members of the Trust and, in so doing, made material misrepresentations and omissions (¶¶ 274-278). However, in particularizing the allegations made by plaintiffs against the various Brokers, the allegations against Cool were limited to claims made by Eden Park Health Services, Inc. ("Eden Park") (Complaint ¶ 279 [i] [pertinent allegations "shall be deemed to have been made by and in favor of each of the following Corporate Plaintiffs against the corresponding Broker"]). As this Court emphasized in the Prior Decision: "[P]laintiffs' claims against the various brokers permissibly are joined together for economy and convenience, but this is not a class action. Giving effect to Paragraph 279 of the Second Amended complaint, it is as if each named plaintiff had filed a separate complaint against a particular insurance broker, with only one such complaint, that of [Eden Park], alleging any wrongdoing against Cool."
It was not until the Third Amended Complaint that Morgan Estates asserted a claim of wrongdoing against Cool (¶ 166 [h], [ee]).[FN3]
 Accordingly, the allegations by Morgan Estates are not entitled to the benefit of the March 10, 2010 filing date of the Second Amended Complaint, and, instead, are governed by the December 17, 2012 commencement date of the Sea Crest Action.
b. Hickey-Finn
Hickey-Finn & Co., Inc. ("Hickey-Finn") was named as a defendant in the First Amended Complaint dated November 2, 2009. This version of the complaint included Hickey-[*5]Finn within the definition of "Broker" (First Amended Complaint, ¶¶ 133, 138), and it alleged that each named Broker made material misrepresentations and omissions in soliciting certain plaintiffs to join or remain members of the Trust (id., ¶¶ 244-248).[FN4]
Subsequent pleadings identified the particular defendant-brokers against whom particular plaintiff-employers were claiming, but none of the prior pleadings alleged that Hickey-Finn had any relationship with plaintiffs or placed any of them into the Trust as an insurance broker (see Second Amended Complaint, ¶ 279; Third Amended Complaint, ¶ 322; Complaint, ¶ 121). Indeed, the prior pleadings did not allege any particular facts regarding the role of Hickey-Finn. Under the circumstances, the Court concludes that the claims against Hickey-Finn were interposed on November 2, 2009 on the filing of the First Amended Complaint.
c. Vanner
Vanner Insurance Agency ("Vanner") was added as a defendant via the Second Amended Complaint and was the subject of claims by Gerry Homes, Gerry Homes Management Co., Inc. and Gerry Nursing Home Co., Inc. (collectively "Gerry Entities") (¶ 279 [j-l]). Accordingly, plaintiffs' claims relate back no earlier than the March 10, 2010 filing date of the Second Amended Complaint.
d. Marshall & Sterling
Marshall & Sterling, Inc. first was named in the Second Amended Complaint. Accordingly, the claims of plaintiff DMN Management Services, LLC ("DMN") relate back no further than March 12, 2010.
e. Hirsch Wolf/HUB
Hirsch Wolf & Company, Inc. ("Hirsch Wolf") first was named as a defendant in the First Amended Complaint. However, it was not until the filing of the complaint in the Sea Crest Action that plaintiffs Sea Crest Health Care Center ("Sea Crest") and Shore View Nursing Home ("Shore View") made allegations of wrongdoing against Hirsch Wolf. Accordingly, the claims against Hirsch Wolf shall be deemed to have been interposed on November 2, 2009, except for the claims alleged by Sea Crest and Shore View, which shall be governed by the December 17, 2012 commencement date of the Sea Crest Action.[FN5]

The Prior Decision granted plaintiffs leave to join HUB International Northeast Limited ("HubNE"), HUB International Group Northeast Inc. ("Hub Group") and HUB International Limited ("HUB International") as defendants (collectively "HUB Defendants" or "HUB"). The HUB Defendants allegedly acquired all of the assets of Hirsch Wolf in a transaction that plaintiffs maintain was a "de facto merger" (Complaint, ¶ 66). Plaintiffs further allege that "HUB and Hirsch Wolf are the alter egos of each other and are liable for the debts, judgments and liabilities of each other" and that HUB, as the alleged successor to Hirsch Wolf, "explicitly and/or impliedly assumed Hirsch Wolf's liabilities, including those against Hirsch Wolf in this action" (id., ¶¶ 51, 74).
The HUB Defendants maintain that plaintiffs' claims do not relate back to those alleged against Hirsch Wolf under CPLR 203 (f) because there is no unity of interest. Specifically, the HUB Defendants argue that plaintiffs' allegation of a de facto merger is conclusively defeated by documentary evidence, and the allegation of alter-ego liability is neither adequately pleaded nor supported by proof in admissible form.
In arguing that plaintiffs' allegation of de facto merger is utterly refuted by documentary evidence, the HUB Defendants submit the affidavit of Ivy Fischer, the general counsel of HubNE. She avers, based upon personal knowledge, that Hub International is a parent company of HubNE, and Hub Group is a corporation that owns the stock of several corporations, including HubNE (¶¶ 4-5). Fischer further avers HubNE, Hub International and HUB Group are separate and distinct corporate entities that maintain the required corporate formalities.
Annexed to the Fischer affidavit is an Asset Purchase Agreement ("APA") executed on or about May 2, 2016. Pursuant to the APA, HubNE purchased certain assets of non-party Hirsch Wolf & Co., LLC ("Hirsch Wolf LLC"),[FN6]
an entity that is alleged to be separate and distinct from Hirsch Wolf. The APA, which identifies HubNE as the purchaser of Hirsch Wolf LLC's assets, provides that said purchaser "shall not assume, or be liable to pay . . . any obligations or liabilities" of the sellers, and such obligations and liabilities shall be retained by and remain the seller's obligations and liabilities (§ 1.3).
Thus, the HUB Defendants argue that the claim of de facto merger is without merit because Hirsch Wolf was not a party to the APA and none of its assets were purchased by HubNE. While conceding that the APA does reference Hirsch Wolf in two places, the HUB Defendants argue that these references were a scrivener's error, and they emphasize that it was Hirsch Wolf LLC, not Hirsch Wolf, that was named as seller in the APA.[FN7]
Relatedly, the HUB [*6]Defendants assert that the Hub Group was not a party to the APA, and Hub International was made a party only because shares of its stock were issued to the sellers as partial consideration for the purchase price.
A corporation that acquires the assets of another company generally is not subject to the liabilities of its predecessor, but liability will attach to the successor if: "(1) it expressly or impliedly assumed the predecessor's tort liability, (2) there was a consolidation or merger of seller and purchaser, (3) the purchasing corporation was a mere continuation of the selling corporation, or (4) the transaction is entered into fraudulently to escape such obligations" (State Farm Fire & Cas. Co. v Main Bros. Oil Co., 101 AD3d 1575, 1577 [3d Dept 2012], quoting Schumacher v Richards Shear Co., 59 NY2d 239, 245 [1983]).
"Under the concept of de facto merger, a successor that effectively takes over a company in its entirety should carry the predecessor's liabilities as a concomitant to the benefits it derives from the good will purchased" (State Farm Fire & Cas., 101 AD3d at 1578 [internal quotation omitted]). "In conducting such an inquiry, [the Court] must consider factors such as . . . whether the successor purchased the predecessor's intangible assets, goodwill, customer lists, accounts receivable, trademarks, and records, and whether there was any continuity of ownership, management, employees or the business in general" (id. at 1578-1579).
There can be no de facto merger without proof of a conveyance of assets from the predecessor to the successor. Here, the plain language of the APA establishes, prima facie, that the asset purchase transaction referenced in the Complaint concerned the acquisition of the assets of non-party Hirsch Wolf LLC and did not involve any conveyance of assets from defendant Hirsch Wolf. Indeed, Hirsch Wolf & Co., Inc. is not identified in the APA as one of the "sellers" of assets, and it is not even a signatory to the agreement. Under the circumstances, plaintiffs' opposition to the motion fails to raise a triable issue of fact as to the applicability of the relation-back doctrine under a de facto merger theory (see Hoosac Val. Farmers Exch., 168 AD2d at 823 [upon a prima facie showing of untimeliness, "the burden shifts to the party opposing the motion to aver evidentiary facts" sufficient to defeat the defense or at least raise factual questions]).[FN8]
As the APA conclusively refutes plaintiffs' allegations of a de facto merger between the HUB Defendants and Hirsch Wolf, and in the absence of proof of any agreement by which the HUB Defendants explicitly and/or impliedly assumed the liabilities of Hirsch Wolf,[FN9]
plaintiffs cannot establish the unity of interest required under the relation-back doctrine on the basis of their successor-liability allegations.
As a second ground for arguing that they are not united in interest with Hirsch Wolf for purposes of relation back, the HUB Defendants contend plaintiffs have failed to sufficiently [*7]plead or establish a basis for concluding that they are the alter egos of Hirsch Wolf.
"A plaintiff seeking to pierce the corporate veil must demonstrate that a court in equity should intervene because the owners of the corporation exercised complete domination over it in the transaction at issue and, in doing so, abused the privilege of doing business in the corporate form, thereby perpetrating a wrong that resulted in injury to the plaintiff" (East Hampton Union Free School Dist. v Sandpebble Bldrs., Inc., 66 AD3d 122, 126 [2d Dept 2009] [citations omitted], affd 16 NY3d 775 [2011]). Corporate separateness also may be disregarded "when a corporation has been so dominated by an individual or another corporation and its separate entity so ignored that it primarily transacts the dominator's business instead of its own and can be called the other's alter ego" (Matter of Island Seafood Co. v Golub Corp., 303 AD2d 892, 893-894 [3d Dept 2003]).
The Court concludes that plaintiffs have failed to allege a legally sufficient alter-ego claim against the HUB Defendants. The Complaint merely states, upon information and belief, that "HUB and Hirsch Wolf are the alter egos of each other and are liable for the debts, judgments and liabilities of one another" (¶ 51). The Court is not obliged to assume the truth of this bare legal conclusion, and the Complaint is devoid of factual allegations that, if credited, would provide a legal basis for disregarding corporate separateness. Moreover, plaintiffs have failed to come forward with evidentiary proof to support such allegations in the context of opposing the HUB Defendants' motion for dismissal under CPLR 3211 (a) (5) (see Hoosac Val. Farmers Exch., 168 AD2d at 823). Accordingly, plaintiffs' alter-ego allegations do not provide a legally sufficient basis for finding that the HUB Defendants are united in interest with Hirsch Wolf so as to raise a question of fact regarding applicability of the relation-back doctrine.[FN10]

Based on the foregoing the Court concludes that plaintiffs' claims against the HUB Defendants were interposed no earlier than the filing of plaintiffs' motion to amend in this action.
f. Treiber
The Treiber Group LLC ("Treiber") first was named as a defendant in the Third Amended Complaint filed on November 12, 2013. Treiber also was named as a defendant in the Summons with Notice filed on December 17, 2012 in the Sea Crest Action by plaintiffs Throggs Neck Care Corp. ("Throggs Neck"), Park Avenue Extended Care Center Corp. ("Park Avenue") and Nassau Extended Care Center Corp. ("Nassau Extended"). As a result of the Stipulation of Discontinuance entered in the Sea Crest Action, the claims made herein by these three plaintiffs are entitled to a December 17, 2012 date of commencement. 
The claims against Treiber by Wen Extended Facility Management Corp. ("Wen") first were interposed in the Third Amended Complaint and, therefore are entitled to a November 12, [*8]2013 date of commencement. Finally, the claims of United Nassau Extended Care Facility Corp. ("United Nassau") against Treiber shall be deemed interposed on July 9, 2015, the date on which United Nassau filed a Summons with Notice disclosing its claims against Treiber.
g. Rampart Agency and Rampart Brokerage
Rampart Agency Corp. ("Rampart Agency") was named as a defendant in the First Amended Complaint filed in the HITNY Action. Accordingly, the claims against Rampart Agency shall be deemed interposed on November 2, 2009.
The Prior Decision granted plaintiffs leave to join Rampart Brokerage Corp. ("Rampart Brokerage") as a defendant. According to its counsel, Rampart Brokerage is the entity that actually placed insurance coverage of behalf of certain plaintiffs Nesconset Nursing Center LLC ("Nesconset") and PALJR, LLC d/b/a East Neck Nursing and Rehabilitation Center ("PALJR"). In arguing that the Complaint is partially barred by the expiration of the statute of limitations, Rampart Brokerage concedes that the claims against it relate back to the claims previously interposed against Rampart Agency.[FN11]

B. Action to Recover Upon a Statutory Liability
Before considering the timeliness of particular causes of action, the Court must address plaintiffs' contention that all of their causes of action are timely under CPLR 214 (2), which provides a three-year limitations period "for an action to recover upon a liability, penalty or forfeiture created or imposed by statute . . . ." Such a claim accrues when a final determination is made as to the statutory liability, penalty or forfeiture (see Matter of Espada 2001 v New York City Campaign Fin. Bd., 59 AD3d 57, 62 [1st Dept 2008]). 
Plaintiffs argue that all of the causes of action alleged in the Complaint exist only because of statutory assessments imposed upon them by the WCB pursuant to the authority of the Workers' Compensation Law and attendant regulations. According to plaintiffs, these liabilities were not finally determined until 2013, when plaintiffs entered into a settlement with the WCB. Thus, plaintiffs contend that all of their claims were timely interposed within three years of the WCB settlement.
This argument is without merit. The three-year limitations period established by CPLR 214 (2) is available only where the cause of action "'would not exist but for the statute'" (see Gaidon v Guardian Life Ins. Co. of Am., 96 NY2d 201, 209 [2001], quoting Matter of Motor Vehicle Acc. Indem. Corp. v Aetna Cas. & Sur. Co., 89 NY2d 214, 220-221 [1996]). Even where a plaintiff invokes a statutory remedy, CPLR 214 (2) will not apply if the "statute merely codifies an existing common-law liability" (GMAC v Vucich, 15 AD3d 106, 108-109 [3d Dept 2005]). Here, the only cause of action governed by CPLR 214 (2) is the General Business Law § 349 claim. The remaining state-law claims alleged in the Complaint are common-law causes of action that are not brought pursuant to any statute, and the RICO claim is brought pursuant to a federal statute that is governed by a federally-prescribed limitations period.
And, of course, plaintiffs are not suing to recover a statutory liability on their common-law claims. Rather, plaintiffs allege that defendants breached duties owed to them in contract [*9]and tort. The fact that the measure of damages sought by plaintiffs on their common-law claims is co-extensive with amounts that plaintiffs have paid, or may be obliged to pay, the WCB pursuant to its statutory authority to issue assessments to self-insured employers to ensure the solvency of the workers' compensation system does not convert this action by Trust members against their insurance brokers into an action to recover upon a liability, penalty or forfeiture created or imposed by statute.
C. Claim-by-Claim Analysis [FN12]
1. Negligent Misrepresentation
A claim of negligent misrepresentation is subject to a three-year limitations period, unless the claim is grounded upon essential allegations of actual or constructive fraud, in which case the claim is governed by a six-year limitations period (Colon v Banco Popular N. Am., 59 AD3d 300, 301 [1st Dept 2009]; see also CIFG Assur. N. Am., Inc. v J.P. Morgan Sec. LLC, 146 AD3d 60, 67 [1st Dept 2016]). Where the misrepresentation claim sounds in actual fraud, plaintiffs also may rely upon the two-year discovery rule (see NYAHSA Servs., Inc., Self-Ins. Trust v People Care Inc., 141 AD3d 785, 790 [3d Dept 2016]). The claim accrues when the misrepresentation is made and relied upon (Gerschel v Christensen, 143 AD3d 555, 557 [1st Dept 2016]; Catanzano v Warren Rosen & Co., 19 AD3d 250 [1st Dept 2005]; IFD Constr. Corp. v Corddry Carpenter Dietz & Zack, 253 AD2d 89, 92-93 [1st Dept 1999]).
Plaintiffs allege that, by virtue of a special relationship between the parties, defendants were under a duty to impart complete and accurate information concerning the financial status of the Trust, the risks associated with becoming a member of the Trust, the ongoing risk associated with remaining a member of the Trust, and the competency of CRM in acting as the administrator of the Trust (Complaint, ¶ 175). Plaintiffs allege that the information provided by defendants in this regard was inaccurate and/or incomplete and, by reasonably relying upon such information, plaintiffs allegedly were denied the opportunity "to take actions to protect [their] interests and to avoid incurring liability in connection with being [members] of the Trust" (id., ¶¶ 176-178).
While the factual allegations supporting the negligent misrepresentation claim are not dependent on essential allegations of actual or constructive fraud, other portions of the Complaint do allege defendants made the challenged representations with an actual intent to deceive plaintiffs (see e.g., ¶ 186). Under the circumstances, the Court is constrained to conclude that the claim is governed by a six-year statute of limitations as well as the two-year discovery rule (see People Care, 141 AD3d at 790).[FN13]

With the exception of the claim against Cool, the negligent misrepresentation claims accrued no later than December 31, 2007. The claims of United Nassau and the claims against the HUB Defendants, which were interposed subsequent to the filing of the Third Amended Complaint, must be dismissed as untimely, since they were interposed more than six years after accrual and are not saved by the two-year discovery rule, which was triggered no later than December 18, 2009, when the forensic audit commissioned by the WCB was completed and delivered.[FN14]
The claim against Cool must also be dismissed, since it was interposed more than six years after the April 1, 2006 accrual,[FN15]
and more than two years after discovery. The negligent misrepresentation claims of the remaining plaintiffs have not been shown to be wholly barred by the expiration of the statute of limitations.
2. Fraud/Aiding and Abetting Fraud
A cause of action alleging fraud in the inducement or the aiding and abetting of fraud must be commenced within six years from the time the fraud was committed or within two years from the time the fraud was discovered or could have been discovered through reasonable diligence (Giarratano v Silver, 46 AD3d 1053, 1056 [3d Dept 2007], citing CPLR 213 [8]; see State of NY Workers' Compensation Bd. v Madden, 119 AD3d 1022 [3d Dept 2014]). For the reasons stated immediately above, the fraud claim alleged by United Nassau and the fraud claims alleged against Cool and the HUB Defendants must be dismissed.
3. Breach of Contract
The statute of limitations for a breach of contract claim is six years (CPLR 213 [2]), and the "cause of action accrues at the time of the breach" (Ely-Cruikshank Co. v Bank of Montreal, [*10]81 NY2d 399, 402 [1993]; see CPLR 203 [a]). Plaintiffs' claims for breach of contract accrued no later than December 31, 2007. Thus, the claim of United Nassau and the claims against the HUB Defendants must be dismissed as entirely time-barred, since they were interposed more than six years after the latest date of accrual. Defendants have failed to demonstrate that the contractual claims of the remaining plaintiffs are wholly barred by the expiration of the statute of limitations.
4. Aiding and Abetting Breach of Fiduciary Duty
The statute of limitations for a claim for aiding and abetting a breach of fiduciary duty depends on the substantive remedy sought. Where, as here, the remedy sought is purely monetary in nature, courts construe the suit as alleging "injuries to property" within the meaning of CPLR 214 (4), which has a three-year limitations period. However, a six-year limitations period with the two-year discovery rule is available insofar as the claim is grounded upon essential allegations of actual fraud (see Kaufman v Cohen, 307 AD2d 113, 119 [1st Dept 2003]). The claim ordinarily accrues on the earliest date upon which the alleged breach of duty causes a plaintiff to sustain injury (see IDT Corp. v Morgan Stanley Dean Witter & Co., 12 NY3d 132, 140 [2009]; cf. Kaufman, 307 AD2d at 126-127 and n 3).
For the reasons discussed previously, the Court concludes that the aiding and abetting claim is subject to the statute of limitations applicable to fraud claims. Accordingly, the claim of aiding and abetting breach of fiduciary duty is entirely time-barred as to the claims alleged by United Nassau and the claims alleged against Cool and the Hub Defendants.
LEGAL SUFFICIENCY
When considering a motion to dismiss for failure to state a cause of action, the Court must liberally construe the pleadings, grant plaintiff the benefit of every favorable inference, and limit its review to a determination as to whether the facts alleged fall within a cognizable legal theory (see CPLR 3211 [a] [7]; Leon v Martinez, 84 NY2d 83, 88 [1994]; Slezak v Stewart's Shops Corp., 133 AD3d 1179, 1179 [3d Dept 2015]). However, the Court need not "accept as true legal conclusions or factual allegations that are either inherently incredible or flatly contradicted by documentary evidence" (1455 Washington Ave. Assoc. v Rose & Kiernan, Inc., 260 AD2d 770, 771 [3d Dept 1999] [internal quotation marks and citation omitted]).
A. Conversion
The first cause of action alleges that each of the defendants "converted the assets of the Plaintiffs paid for workers compensation coverage for their personal use in the form of excessive fees, premiums, salary and bonuses paid by the Trust, intending to deprive Plaintiffs of such assets" (Complaint, ¶ 168). On the basis of this allegation, plaintiffs seek to recover the "amount of assets of the Plaintiffs converted to [defendants'] personal use . . ." (id., ¶ 168).
"'Conversion is any unauthorized exercise of dominion or control over property by one who is not the owner of the property which interferes with and is in defiance of a superior possessory right of another in the property'" (Hart v City of Albany, 272 AD2d 668 [3d Dept 2000], quoting Meese v Miller, 79 AD2d 237, 242 [4th Dept 1981]). "Where, as here, the property is money, it must be specifically identifiable and be subject to an obligation to be returned or to be otherwise treated in a particular manner. Further, where possession of property is initially lawful, conversion occurs when there is a refusal to return the property upon demand" (Salatino v Salatino, 64 AD3d 923, 924 [3d Dept 2009], lv denied 13 NY3d 710 [2009] [internal [*11]quotation marks and citation omitted]).
The Court concludes that the conversion claim fails insofar as plaintiffs seek to challenge the commissions or other payments made by the Trust to the defendant brokers. Once plaintiffs remitted payments for workers' compensation insurance to the Trust, such funds became the property of the Trust, and plaintiffs lost any right to possess or control the use or disposition of the funds. Accordingly, plaintiffs have not alleged "legal ownership or an immediate right of possession to specifically identifiable funds" as to state a claim for conversion (Whitman Realty Group, Inc. v Galano, 41 AD3d 590, 592 [2d Dept 2007]; cf. Heffernan v Marine Midland Bank, N.A., 267 AD2d 83 [1st Dept 1999] [concerning misappropriation of "funds on deposit"]).
Further, insofar as the commissions paid to defendants constitute consideration paid directly or indirectly by plaintiffs for the provision of insurance brokerage services (see Complaint, ¶¶ 120-121), the claim for conversion merely restates plaintiffs' contractual claim. "[A]n action for conversion cannot be validly maintained where damages are merely being sought for breach of contract" (Peters Griffin Woodward, Inc. v WCSC, Inc., 88 AD2d 883 [1st Dept 1983]). This is true even if the insurance broker failed to apply the funds in the manner required by the parties' agreement (see Sutton Park Dev. Corp. Trading Co. v Guerin & Guerin Agency, Inc., 297 AD2d 430, 431-432 [3d Dept 2002] ["All that plaintiffs allege in the 'conversion' cause of action is that [the broker] failed to use the quarterly payments paid by plaintiffs to purchase insurance from the insurers and its subsidiaries which, if true, would clearly be a breach of their contract, and conversion may not be predicated merely on a breach of contract."]).
Finally, it is clear that defendants' possession of the allegedly converted funds initially was lawful. Thus, conversion only could occur where plaintiffs properly demanded the return of the funds and defendants refused to comply with such demand. Plaintiffs have failed to allege a demand and refusal and, therefore, fail to state a cause of action for conversion in any event.
Accordingly, the cause of action alleging conversion is dismissed.
B. Unjust Enrichment
The Complaint alleges that defendants "diverted monies paid [by plaintiffs] for insurance consulting and brokerage services for their own personal use and were unjustly enriched as the result" (Complaint, ¶ 168).
A claim for unjust enrichment "is available only in unusual situations when the defendant has not breached a contract nor committed a recognized tort, but circumstances create an equitable obligation running from the defendant to the plaintiff" (Maya NY, LLC v Hagler, 106 AD3d 583, 584-585 [1st Dept 2013]). "The theory of unjust enrichment lies as a quasi-contract claim. Unjust enrichment is an obligation imposed by equity to prevent injustice, in the absence of an actual agreement between the parties concerned" (IDT Corp., 12 NY3d at 132 [internal citations and quotations omitted]). The cause of action "is not a catchall cause of action to be used when other [causes of action] fail" (Corsello v Verizon NY, Inc., 18 NY3d 777, 790 [2012]).
Plaintiffs contend that they entered into oral or written agreements with defendants whereby defendants performed insurance brokerage and consulting services in exchange for [*12]compensation (Complaint, ¶¶ 120-121). Defendants generally do not deny that allegation.[FN16]
Thus, the claim boils down to the untenable allegation that defendants were unjustly enriched by diverting to their own personal use monies that plaintiffs paid them "directly or indirectly" for rendering services pursuant to a contract.
Further, once plaintiffs remitted premiums to the Trust for workers' compensation insurance, any right that they may have to challenge the Trust's use of such funds is governed by the written contracts between the Trust and its employer-members. And while the Complaint includes a highly conclusory allegation of diversion, there are no allegations of a factual nature alleging that defendants received commissions in excess of the amounts authorized by the Trust or its agents.[FN17]
In fact, the Complaint repeatedly refers to the inflated and excessive commissions paid by the Trust and its agents to defendants (see e.g. Complaint, ¶¶ 102, 118, 156).
Under the circumstances, the Court concludes that the cause of action alleging unjust enrichment must be dismissed (People Care, 141 AD3d at 788; see also Corsello, 18 NY3d at 790-791).[FN18]

C. Negligent Misrepresentation
The third cause of action alleges negligent misrepresentation. "A claim for negligent misrepresentation requires the plaintiff to demonstrate (1) the existence of a special or privity-like relationship imposing a duty on the defendant to impart correct information to the plaintiff; (2) that the information was incorrect; and (3) reasonable reliance on the information" (J.A.O. Acquisition Corp. v Stavitsky, 8 NY3d 144, 148 [2007]). "A special relationship may be established by persons who possess unique or specialized expertise, or who are in a special position of confidence and trust with the injured party such that reliance on the negligent misrepresentation is justified (Mandarin Trading Ltd. v Wildenstein, 16 NY3d 173, 180 [2011]). However, "a special relationship of trust and confidence does not arise merely from an arm's-length business transaction" (Waterscape Resort LLC v McGovern, 107 AD3d 571 [1st Dept 2013]).
With respect to a special relationship, plaintiffs allege that they retained defendants to provide insurance brokerage and consulting services over a period of years and that defendants [*13]acted as their legal representatives with regard to insurance transactions, including the procurement of suitable workers' compensation insurance, an insurance product in which plaintiffs allegedly lack in-house knowledge (see Complaint, ¶¶ 120-127). Plaintiffs further allege that by virtue of these relationships, defendants were on notice that plaintiffs were relying upon their expertise and advice (id., ¶ 128). Liberally construing these allegations and giving plaintiffs the benefit of all reasonable inferences, the Court concludes that the Complaint sufficiently alleges a near-privity relationship between plaintiffs and their respective insurance brokers (see Finch v Steve Cardell Agency, 136 AD3d 1198, 1201-1202 [3d Dept 2016]; South Bay Cardiovascular Assoc., P.C. v SCS Agency, Inc., 105 AD3d 939, 941 [2d Dept 2013]; see also Hoffend & Sons, Inc. v Rose & Kiernan, Inc., 7 NY3d 152, 158 [2006]).[FN19]

The Court further concludes that the claim of negligent misrepresentation has been pleaded with the requisite degree of particularity. CPLR 3016 (b) requires fraud-based claims to be pleaded with particularity, but this requirement is met when the complaint puts the defendant on notice of the incidents complained of, and the material facts alleged in the complaint, in light of the surrounding circumstances, are sufficient to permit a reasonable inference of the alleged misconduct (Goel v Ramachandran, 111 AD3d 783, 792-793 [2d Dept 2013]). Plaintiffs' allegations that defendants misrepresented the financial status of the Trust, the risks associated with joining and remaining a member of the Trust, and the competency of CRM in acting as the administrator of the Trust suffice to put defendants on notice of the conduct that is the subject of the misrepresentation claim.
Finally, while the documentary evidence adduced by defendants calls into question whether plaintiffs will be able to demonstrate the element of reasonable reliance (see infra), plaintiffs have sufficiently alleged such reliance, so as to state a claim for relief at this early stage of the litigation.
Accordingly, the branch of defendants' motions seeking dismissal of claim of negligent misrepresentation under CPLR 3211 (a) (7) is denied.
D. Fraud in the Inducement
Plaintiffs allege that defendants fraudulently induced them to join and remain members of the Trust (Complaint, ¶ 189). The acts or omissions of defendants allegedly giving rise to the fraud claim include: (a) representations that CRM was an experienced self-insured administrator capable of properly administering and managing the Trust; (b) representations that CRM would hire the professionals it needed, at its own expense, to properly administer and manage the Trust; (c) the concealment and/or provision of erroneous and misleading information regarding the true financial condition of the Trust, the Trust's compliance with law and regulation, and the risks associated with Trust membership; (d) failure to warn about joint and several liability; and (e) failure to disclose excessive commissions (id., ¶¶ 182-185). Plaintiffs alleged that these [*14]representations were made by defendants with an intent to deceive and with knowledge that plaintiffs would rely on them in deciding whether to join or remain a Trust member, and plaintiffs did in fact reasonably rely upon such representations (id., ¶¶ 187-188).
A cause of action for fraud requires plaintiff to "'allege a misrepresentation or concealment of a material fact, falsity, scienter by the wrongdoer, justifiable reliance on the deception, and resulting injury'" (Lusins v Cohen, 49 AD3d 1015, 1017 [3d Dept 2008], quoting Zanett Lombardier, Ltd. v Maslow, 29 AD3d 495, 495 [1st Dept 2006]). The circumstances constituting the fraud must be stated in detail (CPLR 3016 [b]). For substantially the reasons stated immediately above, the Court concludes that the allegations of the Complaint are sufficient to state a claim of fraud.
E. General Business Law § 349
The fifth cause of action alleges that defendants engaged in deceptive acts or practices in violation of General Business Law ("GBL") § 349. According to the Complaint, "defendants aggressively marketed and advertised the Trust and [GSITs] to the public at large in general as a safe and less expensive alternative to traditional insurance, that . . . offered protection against catastrophic loss and investment income to help build surplus" (¶ 195). Defendants also are said to have "represented and warranted the competence of CRM . . . , which they warranted and promised would enable the Trust to better control costs and yield substantial savings on worker's compensation insurance coverage costs" (id., ¶ 196). Plaintiffs further allege that defendants "deliberately declined and failed to properly advise [them] of the risks of membership in the Trust . . ." or of the "hidden compensation and commissions paid to [defendants]" (id., ¶¶ 197-198). On the basis of the foregoing, plaintiffs allege that defendants' actions "harmed Plaintiffs, other members of self-insured trusts and the general public in that [defendants'] actions have jeopardized the workers' compensation benefits of New York employers and their employees" (id., ¶ 201).
The elements of a cause of action under GBL § 349 are "first, that the challenged act or practice was consumer-oriented; second, that it was misleading in a material way; and third, that the plaintiff suffered injury as a result of the deceptive act" (Stutman v Chemical Bank, 95 NY2d 24, 29 [2000] [citations omitted]). "Section 349 does not grant a private remedy for every improper or illegal business practice, but only for conduct that tends to deceive consumers" (Schlessinger v Valspar Corp., 21 NY3d 166 [2013]).
The Court concludes that the misconduct alleged by plaintiffs is not consumer-oriented within the meaning of GBL § 349. Plaintiffs are commercial enterprises with a statutory obligation to maintain workers' compensation insurance for their workforce. As such, plaintiffs are not themselves "consumers" (see Benetech, Inc. v Omni Fin. Group, Inc., 116 AD3d 1190, 1191 [3d Dept 2014]; Sheth v New York Life Ins. Co., 273 AD2d 72, 73 [1st Dept 2000]), and there are no allegations of an evidentiary nature demonstrating a broader impact on consumers at large (see Oswego Laborers' Local 214 Pension Fund v Marine Midland Bank, 85 NY2d 20, 25-26 [1995]; Mandelkow v Child & Family Servs. of Erie County, 49 AD3d 1316, 1318 [4th Dept 2008]; State of NY Workers' Compensation Board v 26-28 Maple Avenue, Inc., 80 AD3d 1135 [3d Dept 2011]). Rather, plaintiffs' allegations boil down to nothing more than private contract disputes, unique to the parties, "which do[] "not fall within the ambit of the statute" (Oswego Laborers', 85 NY2d at 25; see North State Autobahn, Inc. v Progressive Ins. Group Co., 102 [*15]AD3d 5, 12 [2d Dept 2012]).
Contrary to plaintiffs' contention, the Third Department's recent decision in Accredited Aides Plus, Inc. v Program Risk Mgt., Inc. (2017 NY Slip Op 00058) is easily distinguishable from this case. Accredited Aides concerned a GBL § 349 claim brought by the employer-members of a GSIT against the administrator of the trust. In determining that the complaint in that case had adequately alleged that the administrator's actions and practices were directed at, or had a broader impact upon, consumers at large, the Third Department relied upon allegations that the administrator made materially misleading statements through advertisements, marketing materials and its Internet website that were disseminated to the general public (id.). Here, in contrast, each plaintiff-employer alleges that a specific broker-defendant made deceptive representations to it regarding the Trust, the risks of Trust membership and matters concerning the administration of the Trust in the context of the particular broker-customer relationship (see 26-28 Maple Avenue, Inc. 80 AD3d at 1136-1137; cf. Elacqua v Physicians' Reciprocal Insurers, 52 AD3d 886, 888 [3d Dept 2008] [challenging "routine practice that affected many similarly situated insureds"]).[FN20]

Based on the foregoing, the Court concludes that the instant dispute is, in essence, one over the methods and means used by particular insurance brokers to induce certain commercial clients to purchase workers' compensation insurance for its workforce, not conduct directed at, or broadly impacting, the consuming public at large (see New York Univ. v Continental Ins. Co., 87 NY2d 308, 320-321 [1995]; 26-28 Maple Avenue, 80 AD3d at 1137; Benetech, 116 AD3d at 1191). Accordingly, this case is controlled by 26-28 Maple Ave and the precedents relied upon therein, and the GBL § 349 claim therefore is dismissed.
F. Civil RICO
Plaintiffs' sixth cause of action alleges that defendants engage in a pattern of racketeering, in violation of 18 USC § 1962 (c). According to the Complaint, the seven GSITs administered by CRM are alleged to constitute the "enterprise", and CRM, the CRM entities and individuals, and defendants allegedly "exerted complete dominion and control over the Trust Enterprise and agreed to and did conduct and participate in the conduct of the [alleged enterprise's] affairs through a pattern of racketeering activity and for the unlawful purpose of intentionally defrauding Plaintiffs and others" (id., ¶ 207). The predicate act of "racketeering" alleged by plaintiffs are "multiple related acts of mail fraud in violation of 18 U.S.C. § 1341, including repeatedly using [*16]the U.S. mails to transmit fraudulent and misleading material to [plaintiffs]" (id., ¶ 208).
The elements that must be pleaded to state a civil Racketeer Influenced and Corrupt Organizations ("RICO") claim are "(1) conduct (2) of an enterprise (3) through a pattern . . . (4) of racketeering activity" (Podraza v Carriero, 212 AD2d 331, 335 [4th Dept 1995] [internal citation and quotation omitted]; see 18 USC § 1962 [c]). "[C]ourts have imposed a heightened pleading requirement" on RICO claims "because such assertion has been found to be "an unusually potent weapon — the litigation equivalent of a thermonuclear device" (Besicorp Ltd. v Kahn, 290 AD2d 147, 151 [3d Dept 2002] [internal quotation marks omitted]). "To sustain a claim under the mail-fraud statute, a plaintiff must establish the existence of a fraudulent scheme and a mailing in furtherance of the scheme. Aside from showing that defendant caused the mailing, it must further be demonstrated that the mailing was for the purpose of executing the scheme or incidental to an essential part of the scheme" (id. at 151 [internal quotations, citations and alterations omitted]).
Plaintiffs' failure to allege particularized facts of an evidentiary nature concerning defendants' use of the mail compels the dismissal of the RICO claim. The Complaint's sole reference to the mail merely alleges, upon information and belief, that defendants "repeatedly us[ed] the U.S. mails to transmit fraudulent and misleading material to the Plaintiff and to other employers in New York" (Complaint, ¶ 208). There is nothing in the Complaint that particularizes the mailings made by specific defendants to specific plaintiffs, the contents of the mailings, the time and place of the mailings, and the manner in which the mailings misled each of the plaintiffs.[FN21]
The absence of the required particularization is particularly egregious here, since plaintiffs were the recipients of the allegedly fraudulent and misleading mailings.
In this connection, the Court is unpersuaded by plaintiffs' reliance on DiVittorio v Equidyne Extractive Indus. (822 F2d 1242 [2d Cir 1987]). DiVittorio holds that, "[w]here multiple defendants are asked to respond to allegations of fraud, the complaint should inform each defendant of the nature of his alleged participation in the fraud" (id. at 1247). Finding that the "derelictions [were] pleaded against the defendants generally, with little or no specification as to individual roles", the Second Circuit dismissed the fraud claims against many of the defendants, but did relax the particularization requirement relative to certain defendants alleged to be "insiders or affiliates" (id. at 1248-1250). With the exception of the alleged relationship between Hirsch Wolf and the HUB Defendants, however, the Complaint alleges that defendants are separate and independent insurance brokerages who entered into distinct relationships with particular plaintiff-employers. Moreover, the Complaint does not allege that the defendant insurance brokers banded together as affiliates or insiders or conspired with one another in furtherance of the alleged racketeering activity. Thus, DiVittorio actually supports dismissal of the RICO claim here.
Finally, the Complaint does not disclose whether any of the alleged mailings were sent for the purpose of executing the fraudulent scheme or whether such mailings were merely incidental thereto.
Accordingly, in the absence of a properly pleaded and particularized claim alleging that defendants engaged in racketeering through a pattern of mail fraud (see Richie v Cavel Corp., 180 AD2d 786, 787 [2d Dept 1992]), the civil RICO claim must be dismissed.
G. Common-Law Indemnification
The seventh cause of action alleged by plaintiffs seeks common-law indemnification. "Implied indemnity is a restitution concept which permits shifting the loss because to fail to do so would result in the unjust enrichment of one party at the expense of the other" (Mas v Two Bridges Assoc., 75 NY2d 680, 690-691 [1990]). "The underpinning of indemnity actions is the prevention of unjust enrichment. In cases where such unfairness would arise from the assumption by a third party of another's debt or obligation, a contract to reimburse or indemnify is implied by law" (State of New York v Stewart's Ice Cream Co., 64 NY2d 83, 88 [1984] [internal quotation marks and citation omitted]). In such a case,
the key element . . . is not a duty running from the indemnitor to the injured party, but rather is a separate duty owed the indemnitee by the indemnitor. The duty that forms the basis for the liability arises from the principle that every one is responsible for the consequences of his own negligence, and if another person has been compelled to pay the damages which ought to have been paid by the wrongdoer, they may be recovered from him
(Raquet v Braun, 90 NY2d 177, 183 [1997] [internal quotation marks and citation omitted]). Thus, to state a claim for implied indemnity, the cause of action must include allegations that the plaintiff-employers and the defendant-insurance brokers owed a common duty to some other party that ought to be discharged by the insurance brokers, rather than the employers, in the interests of fairness.
In Madden, the Third Department held that the professional advisors to a GSIT did not share a common duty with the WCB to maintain the solvency of the subject GSIT; the duties of the professional advisors were owed solely to the GSIT (119 AD3d at 1025). To similar effect is New York State Workers' Compensation Bd. v Fuller & LaFiura, CPAs, P.C. (146 AD3d 1110 [3d Dept 2017]), in which the Third Department sustained the dismissal of an implied indemnity claim against the accountant to a GSIT.
On the other hand, the trustees of a GSIT shared with the WCB "a common duty to the covered employees to ensure that the [GSIT] maintained adequate reserves such that its assets would cover its liabilities" (id.). Likewise, in Murray Bresky Consultants, Ltd. v New York Compensation Manager's Inc. (106 AD3d 1255, 1258-1259 [3d Dept 2013]), the former trust member's claim for implied indemnity against the trustees was sustained "given their common duty to plaintiff's covered employees and to the [WCB] to maintain adequate reserves in the trust so that it was adequately funded and its assets would cover its liabilities" (id.).
Applying these principles and other applicable precedents (see Workers' Compensation Bd. v Compensation Risk Managers, LLC, 51 Misc 3d 683 [Sup Ct, Albany County 2016]),the Court concludes that the claim for implied indemnity must be dismissed. Neither plaintiffs' alleged "special relationship" with the defendant-brokers nor "[the defendant-brokers'] relationship with CRM relative to the administration and oversight of the Trust" gave rise to a statutory, regulatory or other legal duty on the part of defendants to maintain the solvency of the Trust or to otherwise ensure workers' compensation coverage for plaintiffs' employees. 
Simply put, there simply is nothing in law, rule, regulation or contract that requires an insurance broker who placed employers into a GSIT to maintain the solvency of the GSIT. Accordingly, plaintiffs have failed to allege a legally recognized common duty that the defendant-brokers shared with the plaintiff-employers (see also New York State Workers' Compensation Bd. v Consolidated Risk Servs., Inc., 125 AD3d 1250 [3d Dept 2015] [affirming dismissal of implied indemnity claim brought by Trust against insurance broker with respect to the marketing of a GSIT]). Thus, the implied indemnity claim must be dismissed.
H. Breach of Contract
The eighth cause of action, asserted against all defendants except Cool and Hickey-Finn, alleges that defendants breached oral and written agreements to perform insurance counseling and brokerage services. The claimed breaches of contract include: failing to procure suitable workers' compensation coverage; improperly placing plaintiffs in the Trust; diverting plaintiffs' assets for personal use; and failing to properly advise and counsel plaintiffs on the risks of Trust membership (Complaint, ¶ 220).
The essential elements of a breach of contract cause of action are the existence of a valid contract, the plaintiff's performance pursuant to the contract, and the defendant's breach of obligations under the contract (see Clearmont Prop., LLC v Eisner, 58 AD3d 1052 [3d Dept 2009]).
At common law, the duty of an insurance broker or agent is limited to "obtain[ing] requested coverage for their clients within a reasonable time or inform[ing] the client of the inability to do so" (Murphy v Kuhn, 90 NY2d 266, 270 [1997]; see Hoffend & Sons, Inc. v Rose & Kiernan, Inc., 7 NY3d 152, 157-158 [2006]). As the Court of Appeals has observed, "[i]nsurance agents or brokers are not personal financial counselors and risk managers, approaching guarantor status", and it is the insured who generally is in a better position than the agent or broker to protect its own financial interests (Murphy, 90 NY2d at 273). 
Nonetheless, "[e]xceptional and particularized situations may arise in which insurance agents, through their conduct or by express or implied contract with customers and clients, may assume or acquire duties in addition to those fixed at common law" (Murphy, 90 NY2d at 272). In this connection, the Court of Appeals noted that "other jurisdictions have recognized [a duty of advisement] in exceptional situations where, for example, (1) the agent receives compensation for consultation apart from payment of the premiums, (2) there was some interaction regarding a question of coverage, with the insured relying on the expertise of the agent, or (3) there is a course of dealing over an extended period of time which would have put objectively reasonable insurance agents on notice that their advice was being sought and specially relied on" (id. at 272-273).
For essentially the reasons discussed above in connection with the negligent misrepresentation claim, the Court concludes that the Complaint sufficiently alleges that the existence of a special relationship with defendants that, if proven, may give rise to duties on the part of defendants beyond merely procuring the requested insurance coverage. Together with plaintiffs' allegations of written and/or oral contracts with defendants for insurance counseling and brokerage services, plaintiffs' performance of their obligations under such contracts and defendants' breaches thereof, the Court concludes that plaintiffs have stated a claim for breach of contract and, therefore, the branch of defendants' motion seeking dismissal of the claim under [*17]CPLR 3211 (a) (7) must be denied.
I. Negligence
The ninth cause of action, asserted against all defendants except Cool, Hickey-Finn and Treiber, alleges that defendants were negligent in the provision of insurance consulting and brokerage services (Complaint, ¶ 225). Plaintiffs assert that, "[s]eparate and apart from their respective contractual obligations, each of the Defendants owed a general duty to Plaintiffs to exercise reasonable care in the discharge of their insurance consulting and brokerage services" (id., ¶ 224). Defendants' negligence is said to include: failing to exercise reasonable care and skill in providing insurance consulting and brokerage services; failing to disclose the risks associated with the Trust and with GSIT membership generally; failing to ascertain and/or disclose the true financial condition of the Trust; failing to recognize and advise plaintiffs that coverage from the Trust was not the same as traditional insurance coverage; acting in concert with CRM to increase the membership of the Trust, despite a mounting deficit; compromising their professional judgment based upon the relationship with CRM; failing to provide timely renewal quotes; and recommending that unsuitable employers be placed in the Trust (id., ¶ 226).
The Court concludes that the negligence claim must be dismissed as duplicative of plaintiffs' claim for breach of contract. Plaintiffs rely upon the essentially the same allegations of wrongdoing as in their claim for breach of contract, they have "failed to allege a legal duty independent of the underlying [alleged] contracts, and [have] demanded damages identical to those set forth in its breach of contract claim" (People Care, 141 AD3d at 788, supra).[FN22]

J. Aiding and Abetting Breach of Fiduciary Duty
Plaintiffs allege that all of the defendants, except for Cool and Hickey-Finn, knowingly induced and participated in CRM's breaches of fiduciary duty (Complaint, ¶ 234). "A claim for aiding and abetting a breach of fiduciary duty requires: (1) a breach by a fiduciary of obligations to another, (2) that the defendant knowingly induced or participated in the breach, and (3) that plaintiff suffered damage as a result of the breach" (Kaufman, 307 AD2d at 125 [internal citations omitted], supra).
The Complaint alleges that defendants knowingly induced and participated in the breaches of duty committed by CRM by acting in concert with the group administrator to increase the membership of the Trust, despite a mounting deficit. The brokers' assistance allegedly took the form of aggressively marketing Trust membership as a relatively safe and conservative alternative to regulated insurance products, all while receiving excessive, hidden commissions from CRM. The Complaint also cites examples of misrepresentations made by certain brokers that were directed at plaintiffs and alleges that the brokers acted with scienter in making these false representations, thereby permitting the rational inference that the brokers had [*18]actual knowledge of the misconduct allegedly perpetrated by CRM (see AIG Fin. Prods. Corp. v ICP Asset Mgt., LLC, 108 AD3d 444, 446 [1st Dept 2013]). Under the circumstances, the Court the branch of defendants' motions seeking dismissal of the aiding-and-abetting breach of duty claim is denied.
K. Aiding and Abetting Fraud
The eleventh cause of action, alleged against all defendants except Cool and Hickey-Finn, claims that defendants aided and abetted CRM's fraud. According to the Complaint, CRM allegedly misrepresented and concealed material information concerning: (a) the level of risk associated with becoming a member of a GSIT; (b) CRM's qualifications and experience; (c) compliance with applicable laws, regulations and contracts; (d) the Trust's true financial condition; and (e) the potential liabilities and risks associated with Trust membership (Complaint, ¶ 238). Defendants are said to have knowingly induced and participated in this fraud by: (a) acting in concert with CRM to increase the membership of the Trust despite a mounting deficit; (b) aggressively marketing Trust membership as a relatively safe and conservative alternative, while negotiating, pursuing and accepting excessive and hidden commissions; (c) endorsing misleading and inaccurate information provided by CRM and the Trust; and (d) using marketing materials to convince plaintiffs to join and/or remain in the Trust on an annual basis" (id., ¶ 242). 
"To plead a cause of action to recover damages for aiding and abetting fraud, the complaint must allege the existence of an underlying fraud, knowledge of the fraud by the aider and abettor, and substantial assistance by the aider and abettor in the achievement of the fraud" (Winkler v Battery Trading, Inc., 89 AD3d 1016, 1017 [2d Dept 2011]; see also Oster v Kirschner, 77 AD3d 51, 55 [1st Dept 2010]). For substantially the reasons stated above, the Court concludes that the Complaint sufficiently alleges a claim of aiding and abetting fraud.
DOCUMENTARY EVIDENCE
Dismissal is warranted under CPLR 3211 (a) (1) "where the documentary evidence utterly refutes plaintiff's factual allegations, conclusively establishing a defense as a matter of law" (Ganje v Yusuf, 133 AD3d 954, 956 [3d Dept 2015] [internal quotation marks and citation omitted]; see Goshen v Mutual Life Ins. Co. of NY, 98 NY2d 314, 326 [2002]; Consolidated Risk Servs., Inc., 125 AD3d at 1256). "Materials that clearly qualify as documentary evidence include documents reflecting out-of-court transactions such as mortgages, deeds, contracts, and any other papers, the contents of which are essentially undeniable" (Midorimatsu, Inc. v Hui Fat Co., 99 AD3d 680, 682 [2d Dept 2012], lv dismissed 22 NY3d 1036 [2013] [internal quotation marks and citations omitted]; see also Rabos v R & R Bagels & Bakery, Inc., 100 AD3d 849, 851 [2d Dept 2012]).
As an initial matter, certain defendants rely upon client affidavits that are said to utterly refute the allegations of the Complaint. While these affidavits, if credited, call into question the factual bases for certain of plaintiffs' allegations, "affidavits submitted by a defendant do not constitute documentary evidence upon which a proponent of dismissal can rely" (Crepin v Fogarty, 59 AD3d 837, 838 [3d Dept 2009]).
Many of the defendants insist that allegations essential to plaintiffs' causes of action are conclusively refuted by the Joinder and Indemnification Agreements executed by plaintiffs when they joined the Trust. Specifically, these defendants argue that the gravamen of the Complaint is [*19]that they failed to adequately warn or advise plaintiffs of the potential for joint and several liability, but the Joinder and Indemnification Agreements manifest plaintiffs' clear acknowledgment of, and assent to, the imposition of such liability. Thus, defendants argue that plaintiffs' actual knowledge of their potential for joint and several liability, together with the "simple common sense" inferences drawn therefrom,[FN23]
conclusively defeat all of the causes of action alleged in the Complaint. 
This Court rejected a similar argument raised in opposition to plaintiffs' motion to amend, stating that "the unauthenticated documentary evidence offered in opposition to the motion, while perhaps calling into question the merits of certain causes of action, fails to establish that the proposed claims are patently lacking in merit such that amendment would be futile" (Prior Decision, at 25). In the context of an application brought under CPLR 3211 (a) (1), the issue becomes whether the documentary evidence relied upon by the proponent of dismissal conclusively resolves all factual issues as a matter of law.
As plaintiffs observe, the documentary evidence relied upon by defendants does not address all of plaintiffs' allegations of wrongdoing, including complaints that the defendant brokers engaged in deceptive, misleading and fraudulent sales practices, failed to impart accurate and complete information concerning the Trust's finances, and acted in concert with CRM to increase membership despite knowledge of the Trust's mounting fiscal deficit based on inappropriate financial incentives. These allegations may bear to some degree on the false representations allegedly made to plaintiffs and the reasonableness of any reliance thereupon, whether defendants breached contractual duties owed to plaintiffs, and the extent to which defendants participated in CRM's alleged breaches of duties and frauds.
Defendants appear to acknowledge as much, but argue that even assuming the truth of plaintiffs' allegations, the Complaint would not state a cause of action absent the allegations concerning joint and several liability. Defendants observe that the principal measure of damages sought by plaintiffs is the amounts they owe to the WCB in assessments and monetary claims for their period of Trust membership, and they maintain that such claims and assessments are based upon the workers' compensation liabilities of all participating employers incurred during their period of Trust membership. Thus, defendants argue that the damages sought by plaintiffs arise from a risk to which they expressly acknowledged and understood prior to joining the Trust.
The Court does not find this argument to be persuasive. Even assuming that the documentary evidence adduced by defendants conclusively establishes that plaintiffs assented to the imposition of joint and several liability and knew (or should have known) that the loss experiences of other HITNY members and/or the financial condition of the Trust could oblige them to make further contributions, it does not necessarily follow that plaintiffs agreed to bear the financial consequences of defendants' alleged provision of deceptive, misleading and fraudulent information, even where the requested measure of damages is increased joint and several liability for assessments and contributions.
Finally, in addition to the Joinder and Indemnification Agreement, Rampart Agency and [*20]Rampart Brokerage (collectively "Rampart") submits documentation showing that, upon each renewal of the Trust membership, the three plaintiffs to whom Rampart provided brokerage services were reminded of the risks of joint and several liability "in the event of the Trust's inability to pay claim obligations." In fact, the documents submitted by Rampart specifically advised that these plaintiffs could be subject to additional assessments if the Trust became underfunded and that such liability was not limited to the original premium contribution or any defined multiple thereof. Further, Rampart's correspondence to its clients stated that it cannot and will not assume liability arising out of the insolvency of the Trust or the Trust's inability to pay claims, and one of the communications went so far as to advise the client to consider an alternative to the Trust, stating: "the 15% difference in premium doesn't really warrant the exposure the insured faces in the Trust." Moreover, these documents appear to be signed by representatives of the plaintiffs who are alleging claims against Rampart.
While the documents submitted by Rampart provide an overwhelming rebuttal to the broad, conclusory and largely unsupported allegations of wrongdoing alleged by plaintiffs, the Court concludes that these documents do not provide a complete defense to the Complaint. As stated in the Prior Decision, these documents are unauthenticated, and it is unclear who executed these documents on behalf of plaintiffs, what their authority was, and whether any of the misrepresentations alleged by plaintiffs induced their signatures. Moreover, while a principal of Rampart submits an affidavit asserting that the documents are business records, the affidavit does not lay the proper foundation for consideration of the documents as such. 
Based on the foregoing, the Court concludes that the documentary evidence adduced by defendants fails to utterly and conclusively refute the allegations of the Complaint.
REMAINING ARGUMENTS
A. Hickey-Finn
Hickey-Finn argues that the remaining claims alleged against it must be dismissed because it did not serve as an insurance broker to the any of the named plaintiffs. The Court agrees. Plaintiffs allege, upon information and belief, that "each of the defendants is a duly licensed insurance broker with whom one or more of the plaintiffs entered into a contractual relationship in order to procure workers compensation insurance" (Complaint, ¶ 44), but no plaintiff has made a particularized claim with respect to Hickey-Finn (id., ¶ 166). 
In fact, in opposition to Hickey-Finn's motion, plaintiffs concede that they did they did not contract with Hickey-Finn for insurance brokerage services. Rather, plaintiffs seek to recast their allegations against Hickey-Finn by claiming that it injured plaintiffs as a whole, because the HITNY Trustees' errors and omissions insurance was purchased through Hickey-Finn, and Hickey-Finn placed other employers into other GSITs managed by CRM. 
In the Prior Decision, the Court denied plaintiffs leave to allege these very allegations, finding that the prior pleadings in this action and in the HITNY Action did not accord Hickey-Finn notice of the specific transactions or occurrences upon which plaintiffs now seek to premise liability:
The prior pleadings merely included Hickey-Finn within the group of insurance brokers that allegedly breached duties owed to plaintiffs in connection with joining or remaining members of the Trust. There was nothing in the prior pleadings that apprised Hickey-Finn that it faced the prospect of liability in connection with CRM's purchase of insurance [*21]for the Trustees or on account of any alleged conflicts of interest.
Accordingly, the Court concludes plaintiffs cannot defeat Hickey-Finn's motion for dismissal by relying upon new factual allegations that they were denied leave to add to the Complaint. And in the absence of these allegations and with plaintiffs' concession that Hickey-Finn did not render insurance brokerage services to any of the plaintiffs, there is no basis for imposing liability upon Hickey-Finn. Moreover, even if the Court were to consider the merits of plaintiffs' new and unpleaded allegations, the Court adheres to its prior ruling that relation-back is unavailable, and, therefore the remaining claims against Hickey-Finn would be time-barred in any event.[FN24]
Accordingly, the Complaint must be dismissed in all respects against Hickey-Finn.
B. Rampart Agency
Rampart Agency seeks dismissal of the claims alleged against it on the ground that it has been improperly named as a defendant in this action. It submits an affidavit from the chairman of Rampart Brokerage, who avers that plaintiffs purchased workers' compensation insurance from Rampart Brokerage, not Rampart Agency (Affidavit of Stanley Morris, ¶¶ 5-9, sworn to July 9, 2014). Morris acknowledges that there is New York corporation named Rampart Agency, but avers that such corporation does not operate under the name "The Rampart Group" and was not involved in placing workers' compensation insurance on behalf of plaintiffs. Morris further avers that Rampart Agency is separate and distinct corporation from Rampart Brokerage (id., ¶¶ 10-15).
While the proof adduced by Rampart Agency is not without force, "affidavits submitted by a defendant do not constitute documentary evidence upon which a proponent of dismissal can rely" (Crepin, 59 AD3d at 838; see Consolidated Risk Servs., Inc., 125 AD3d at 1257, supra; Madden, 119 AD3d at 1029, supra). And in the absence of the client affidavit, the other corporate documents submitted by Rampart fail to utterly refute the allegations of plaintiffs' Complaint. 
CONCLUSION
Accordingly,[FN25]
it is
ORDERED the following causes of action are dismissed in all respects: conversion (1st) unjust enrichment (2nd); General Business Law § 349 (5th); RICO (6th); common-law indemnification (7th); and negligence (9th); and it is further
ORDERED that the remaining claims of United Nassau are dismissed in all respects; and it is further
ORDERED that the causes of action for negligent misrepresentation (3rd) and fraud in the inducement (4th) alleged against Cool, Hickey-Finn and the HUB Defendants are dismissed; and it is further
ORDERED that the causes of action for breach of contract (8th), aiding and abetting [*22]breach of fiduciary duty (10th) and aiding and abetting fraud (11th) alleged against the HUB Defendants are dismissed; and it is further
ORDERED that the remaining parties to this action shall confer regarding a schedule for discovery (including expert disclosure in accordance with the Rules of the Commercial Division) and the filing of a note of issue and, within thirty (30) days, either: (i) stipulate to a scheduling order, which shall be submitted to the Court for approval; or (ii) request a scheduling conference with the Court.
This constitutes the Decision and Order of the Court. The original Decision and Order is being transmitted to counsel for Cool, Hickey-Finn and Vanner; all other papers are being transmitted to the Albany County Clerk. The signing of this Decision and Order shall not constitute entry or filing under CPLR Rule 2220. Counsel is not relieved from the applicable provisions of that Rule respecting filing, entry and Notice of Entry.
Dated: May 4, 2017
Albany, New York
RICHARD M. PLATKIN
A.J.S.C.
Papers Considered:
Notice of Motion to Dismiss, dated December 30, 2016;
Affidavit of Kathleen A. Barclay, Esq., sworn to December 30, 2016, with attached exhibits A-L;
Memorandum of Law of Cool Insuring, Hickey-Finn and Vanner in Support of Motion to Dismiss the Amended Complaint, dated December 30, 2016;
Memorandum of Law in Opposition to Defendants Cool Insuring, Hickey-Finn & Vanner's Motion to Dismiss Plaintiff's Complaint; dated January 20, 2017;
Affirmation of Linda J. Clark, Esq., dated January 20, 2017, with attached exhibits A-J;
Reply Memorandum of Law of Cool Insuring, Hickey-Finn, and Vanner in support of Motion to Dismiss the Amended Complaint, dated February 17, 2017;
Affidavit of Michael Plunkett, sworn to December 27, 2016, with attached exhibits A-D;
Hirsch Wolf's, Marshall & Sterling's Notice of Motion to Dismiss, dated December 29, 2016;
Affirmation of Stephen C. Cunningham, Esq. in support of Hirsch Wolf, Marshall & Sterling and Treiber's Motion to Dismiss, dated December 29, 2016, with attached exhibits A-I;
Memorandum of Law in Opposition to Motion of Defendants Hirsch Wolf, Marshall & Sterling and Treiber to Dismiss Plaintiffs' Complaint, dated January 20, 2017;
Affirmation in Opposition of Linda J. Clark, Esq., dated January 20, 2017, with attached exhibits A-J;
Memorandum of Law in Support of Hirsch Wolf's, Marshall & Sterling's and Treiber's Motion to Dismiss, dated December 29, 2016;
Reply Affirmation of Stephen C. Cunningham, Esq. in further support of Hirsch Wolf's, Marshall & Sterling's and Treiber's Motion to Dismiss, dated February 17, 2017, with attached exhibits J-L;
Hirsch Wolf's, Marshall & Sterling's and Treiber's Reply Memorandum of Law in Further Support of Motion to Dismiss, dated February 17, 2017;
Notice of Motion, dated December 28, 2016;
Affirmation of Lee E. Berger in Support of HUB's Motion to Dismiss the Amended Complaint, [*23]dated December 28, 2016, with attached exhibits A-D;
Memorandum of Law in Support of HUB's Motion to Dismiss the Amended Complaint, dated December 28, 2016;
Memorandum of Law in Opposition to HUB Defendants' Motion to Dismiss Plaintiffs' Amended Complaint, dated January 20, 2017;
Affirmation in Opposition of Linda J. Clark, Esq., dated January 20, 2017, with attached exhibits A-L;
Memorandum of Law in Further Support of HUB's Motion to Dismiss the Amended Complaint, dated February 17, 2017;
Reply Affirmation of Lee E. Berger, Esq. in further support of HUB's Motion to Dismiss the Amended Complaint, dated February 17, 2017;
Notice of Motion, dated December 28, 2016;
Affirmation of Jeffrey M. Kadish, Esq., dated December 28, 2016, with attached exhibits A-E;
Memorandum of Law on behalf of Defendant, Rampart Brokerage Corp., in support of Motion to Dismiss the Complaint, undated;
Memorandum of Law in Opposition to Defendants' Rampart Brokerage Corp. and Rampart Agency, Inc. d/b/a The Rampart Group's Motion to Dismiss Plaintiffs' Amended Complaint, dated January 20, 2017;
Affirmation in Opposition of Linda J. Clark, Esq., dated January 20, 2017, with attached exhibits A-I;
Reply Memorandum of Law on behalf of defendant, Rampart Brokerage Corp., in further support of the Motion to Dismiss the Complaint, undated.
Reply Affirmation of Jeffrey K. Kadish in further support of Rampart's Motion to Dismiss Plaintiffs' Complaint, dated February 17, 2017;
Notice of Motion to Dismiss Complaint, dated December 29, 2016;
Memorandum of Law of Spain, Reis and Shel-Bern in Support of Motion to Dismiss Complaint, dated December 29, 2016;
Affirmation of Lloyd J. Herman, Esq., dated October 24, 2016, with attached exhibits A-B;
Memorandum of Law in Opposition to Defendants' Spain, Reis and Shel-Bern's Motion to Dismiss Plaintiffs' Amended Complaint, dated January 20, 2017;
Affirmation in Opposition of Linda J. Clark, Esq., dated January 20, 2017, with attached exhibit A-G;
Reply Memorandum of Law of Spain, Reis and Shel-Bern in further support of Motion to Dismiss Complaint, dated February 17, 2017;
Affirmation of Lloyd J. Herman, Esq. in further support of Motion to Dismiss, dated February 17, 2017, with attached exhibits 4-5.



Footnotes

Footnote 1:On March 31, 2010, CRM applied for an order from the New York State Litigation Coordinating Panel ("LCP") coordinating certain pending actions, including the Member Action. The LCP (Freedman, J.) issued an Order to Show Cause on April 16, 2010 staying pre-trial proceedings in all of the cases that were the subject of the coordination application. The LCP ultimately granted the request for coordination on February 23, 2011, and the coordinated cases were transferred to the undersigned as Coordinating Justice. By order dated March 9, 2011, this Court scheduled an initial conference and continued the LCP's stay of proceedings pending entry of a scheduling order. However, on or about April 29, 2011, Majestic Capital Ltd. f/d/b/a CRM Holdings, Ltd., filed for federal bankruptcy protection, resulting in a bankruptcy stay with respect to certain defendants, including CRM. Stays remained in effect until February 14, 2013.

Footnote 2:The Reis Group ("Reis"), Shel-Bern Associates ("Shel-Bern") and Spain Agency, Inc. ("Spain") have not moved for dismissal under CPLR 3211 (a) (5).

Footnote 3:In the current version of the Complaint, Morgan Estate has withdrawn this particularized allegation (see ¶ 166), although Morgan Estates remains a plaintiff and Cool remains defined as a "Broker" (see ¶¶ 45, 62).

Footnote 4:Hickey-Finn also was named in the Original Complaint, but plaintiffs amended that pleading prior to service.

Footnote 5:There is nothing in the prior pleadings in this action that put Hirsch Wolf on notice of the claims of Sea Crest and Shore, and any notice of such claims that Hirsch Wolf may have gained from other sources is not cognizable under the relation-back doctrine (see Lawyers' Fund, 80 AD3d at 1130; August Bohl, 74 AD3d at 1650). Moreover, settled law holds that "[a] new party plaintiff may relate its claim back to an original complaint for statute of limitations purposes only if both claims arise out of the same transaction or occurrence and the new plaintiff and original plaintiff are so closely related or united in interest that the original claim would have given the defendant notice of the potential liability for the subsequent claim" (Fazio Masonry, Inc. v Barry, Bette & Led Duke, Inc., 23 AD3d 748, 749 [3d Dept 2005]). Plaintiffs have not shown that they are united in interest, and it is apparent that Hirsch Wolf's potential monetary liability increased with the joinder of every new plaintiff.

Footnote 6:The Prior Decision denied plaintiffs leave to join Hirsch Wolf LLC as a defendant based upon plaintiffs' failure to sufficiently allege a basis for alter-ego liability. Accordingly, it is clear that references to Hirsch Wolf in the Complaint must be understood as referring to Hirsch Wolf Co., Inc. Further, the record shows that plaintiffs commenced a new action against Hirsch Wolf, LLC subsequent to issuance of the Prior Decision.

Footnote 7:Fischer avers that the other documentation annexed to the APA, including insurance brokerage licenses, corporate documents and financial statements further confirms that the assets of Hirsch Wolf LLC, and not Hirsch Wolf, were the subject of the transaction (¶ 13). However, this documentation does not appear to be part of the present record.

Footnote 8:To be sure, the title page of the APA does refer to Hirsch Wolf, but this page does not create any legal rights or obligations. The other reference to Hirsch Wolf is found a provision requiring a post-acquisition name change, but it is apparent from the text of Section 5.5 and from the documentary evidence submitted by HubNE that the name-change requirement was directed at Hirsch Wolf LLC, not Hirsch Wolf.

Footnote 9:In fact, the APA expressly provides to the contrary, declaring that purchaser shall not assume the sellers' liabilities.

Footnote 10:This is true even if plaintiffs' allegations regarding HUB Defendants' alleged acquisition of assets from Hirsch Wolf were not conclusively defeated by documentary evidence. After all, plaintiffs allege that, upon the de facto merger, "Hirsch Wolf ceased ordinary business operations" (Complaint, ¶ 68). Thus, there is no basis to find that the HUB Defendants injured plaintiffs through any wrongful abuse or domination of Hirsch Wolf. And even the HUB Defendants had become the alter ego of Hirsch Wolf by acquiring its assets on or about May 2, 2006 in the manner claimed by plaintiffs, any such abuse or domination of Hirsch Wolf could not have existed prior to such date.

Footnote 11:In their statute of limitations analysis, both Rampart Brokerage and Rampart Agency rely upon the November 9, 2009 filing of the First Amended Complaint as the date upon which the claims against them were interposed (see Memorandum of Law on Behalf of [Rampart], at 4, 6).

Footnote 12:In light of the CPLR 3211 (a) (7) dismissal of the claims alleging conversion, unjust enrichment, violation of General Business Law § 349, civil RICO, common-law indemnity and negligence (see infra), the Court need not consider whether such claims are barred in whole or in part by the expiration of the statute of limitations.

Footnote 13:In this Court's view, a sounder approach would be to apply the three-year limitations period to the negligent misrepresentation claim. As pleaded, plaintiffs' claim of negligent misrepresentation is not grounded on essential allegations of fraud, and plaintiffs' recovery on such claim does not depend on proof of scienter. Rather, the claim of negligent misrepresentation appears to be pleaded as an alternative to plaintiff's claims of actual fraud, and the claim should be treated as such. Nonetheless, the Appellate Division reached a different conclusion in People Care on substantially similar factual allegations. The Court notes, however, that if plaintiffs ultimately are unable to prove their sweeping allegations of fraud and deceit, and the cause of action for negligent misrepresentation instead is left to rest solely on proof that defendants were negligent in making the alleged misrepresentations, the timeliness of the claim ultimately will be measured against the three-year limitations period applicable to claims of negligence.

Footnote 14:The Court concludes that the affidavit of David Smeltzer fails to conclusively establish that the Gerry Entities were sufficiently possessed of knowledge from the which the alleged fraud could be inferred at any earlier date.

Footnote 15:As discussed in the Prior Decision, Cool submits proof that its involvement with Morgan Estates, the only plaintiff-employer to whom it provided insurance brokerage services, ended by April 1, 2006. Specifically, Michael Plunkett, a vice president of Cool, avers that Morgan Estates came to Cool in or about July 2004 while already a member of the Trust. Cool handled the renewal of Morgan Estate's membership in the Trust for the policy period from April 1, 2005 until April 1, 2006. However, on March 31, 2006, Morgan Estates advised in writing that it would not be renewing its workers' compensation coverage with Cool. In opposition to this showing, plaintiffs have failed to raise a triable issue of fact.

Footnote 16:None of the plaintiffs have claimed a contractual relationship with Hickey-Finn or Cool (see Complaint, ¶ 166). But the claim fails against these two defendants in any event, since there is no allegation that any plaintiff paid Hickey-Finn or Cool money for insurance brokerage or consulting services, the source of the funds by which defendants are said to have been unjustly enriched (see also Complaint, ¶ 102 [alleging that CRM made inflated, excessive and/or undisclosed payments to defendants in exchange for placing employers in the Trust]). 

Footnote 17:And if defendants had received (or taken) funds from the Trust in excess of those to which they were contractually or legally entitled, the claim would belong to the Trust, not the members.

Footnote 18:Contrary to plaintiffs' contention, this is not a case like New York State Workers' Compensation Bd. v Marsh U.S.A., Inc. (41 Misc 3d 1215[A] [Sup Ct, Albany County 2013]), where the Court declined to dismiss the entirety of the unjust enrichment claim because of an alleged gap in the parties' contractual relationship.

Footnote 19:Rampart contends that it is entitled to dismissal of all of plaintiffs' claims that require proof of a special relationship "[u]nless plaintiffs can provide admissible evidence of a material fact in opposition to the instant Motion that would establish a special relationship" (Rampart MOL, at 11). However, summary judgment is unavailable at this juncture since issue has not yet been joined (CPLR 3212 [a]), and the Court has not treated Rampart's motion to dismiss as one for summary judgment (see CPLR 3211 [c]).

Footnote 20:It bears noting that Complaint contains no allegations whatsoever concerning defendants' advertising of the Trust on a wide-scale, public level. The only discussion of such marketing occurs in the context of CRM and its alleged marketing of the Trust to plaintiffs or internal discussions between CRM and defendants regarding marketing (see Complaint, ¶¶ 101-119). With respect to defendants' marketing of the Trust, the Complaint merely cites certain letters, other individualized solicitations and oral communications from particular defendants to particular plaintiffs (see e.g. id., ¶¶ 115, 117, 138, 140-141, 145, 146). Thus, rather than supporting "consumer-oriented" conduct within the meaning of GBL § 349, these isolated instances of specific, one-on-one alleged communications between the brokers and their individual clients are the precise type of dealings that the 26-28 Maple Avenue Court held were not consumer-oriented for GBL § 349 purposes.

Footnote 21:Insofar as plaintiffs argue in opposition that they demonstrated acts of wire fraud, the Court notes that the Complaint does not plead wire fraud as predicate acts and, in any event, proof of intrastate telephone calls is not proof of federal wire fraud.

Footnote 22:The Court recognizes that New York law generally permits claims against insurance brokers to be brought under theories of contract or tort. For this reason, certain defendants have moved for dismissal of the negligence claim as redundant of the contractual claim, whereas other defendants have moved for dismissal of the contractual claim as redundant of the negligence claim. Given that both claims arose out plaintiffs' alleged contractual relationship with defendants, the Court considers the tort claim to be redundant under the facts and circumstances alleged in the Complaint.

Footnote 23:According to defendants, plaintiffs' execution of the Agreements further represented their acknowledgment that the loss experiences of other Trust members could affect their liability and subsequent adjustments could oblige plaintiffs to make further contributions to the Trust.

Footnote 24:Specifically, applying the statute-of-limitations analysis set forth above, the time in which to interpose the two remaining claims against Hickey-Finn, negligent misrepresentation and fraudulent inducement, expired on December 31, 2013.

Footnote 25:The Court has considered the parties' remaining arguments and contentions, but finds them unavailing and/or unnecessary to the disposition ordered herein.